Filed 3/13/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re O.F., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>O.F.,<br><br>Defendant and Respondent. | A166528<br><br>(Alameda County<br>Super. Ct. No. JV-027701-09) |

O.F. was 14 years old when he joined a criminal street gang, after which he amassed an extensive and serious two-year record of criminal delinquency that culminated in his involvement with two adult coparticipants in the November 2019 shooting deaths of two minors associated with a rival gang.

In early 2020, a juvenile wardship petition was filed charging O.F., age 16, with two counts of murder. The juvenile court held an amenability hearing over many months to determine whether O.F. was amenable to rehabilitation while in the court's jurisdiction or whether he should be transferred to criminal court under Welfare and Institutions Code section

1

707.[1]  Meanwhile, O.F. behaved and performed exceptionally well during his more than two years in juvenile hall.  The record is replete with positive and uncontradicted testimony about his rehabilitative efforts and successes, including his consistent and sincere engagement in therapeutic and other services, his academic progress, and his demonstrated potential for maturity and growth.  Notwithstanding such uncontradicted evidence, the juvenile court concluded in November 2022 that O.F. was not amenable to rehabilitation while under the court's jurisdiction.  In so concluding, the court determined that all five of the statutory criteria set forth in section 707, subdivision (a)(3)—including its finding that O.F. was incapable of rehabilitation prior to expiration of jurisdiction—weighed in favor of transfer.

We conclude the juvenile court's order must be reversed in light of subsequent retroactive changes in the law that have renewed the focus of section 707's inquiry on a minor's amenability to rehabilitation.  Specifically, Assembly Bill No. 2361 (2021–2022 Reg. Sess.) ("AB 2361") raises the prosecution's burden of proof and requires a specific finding regarding the minor's amenability to rehabilitation, and California Rules of Court, rule 5.770 ("rule 5.770") was amended to comport with these changes.  Additionally, Senate Bill No. 545 (2023–2024 Reg. Sess.) ("SB 545") requires the court to give weight to various statutory factors that were previously discretionary.  Here, the juvenile court's decision rested in part on evidence that does not meet the heightened burden of proof.  Moreover, the record indicates the court did not weigh several now-mandatory factors with the appropriate view towards O.F.'s amenability to rehabilitation.  Accordingly,

---

[1]  Further undesignated statutory references are to the Welfare and Institutions Code.

2

we will reverse the transfer order and remand for a new amenability determination consistent with current law and the views expressed herein.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Prior Delinquency History

O.F.'s delinquency history dates back to January 2017 when he was arrested for robbery at the age of 14. Following his admission to misdemeanor assault with force likely to produce great bodily injury, O.F. was adjudged a juvenile court ward and placed on formal probation. A few months later, O.F. was arrested for vehicle theft, and following his admission to a misdemeanor violation of Vehicle Code section 10851, subdivision (a), formal probation was maintained. He was ordered to participate in six months of counseling through Seneca MultiSystemic Therapy ("MST").

In August 2017, O.F. was arrested for felony possession of stolen property and carrying a concealed weapon, and misdemeanor resisting arrest and possessing burglary tools. Formal probation was again maintained following O.F.'s admission to the misdemeanor counts. O.F. was referred to Lincoln Families MultiDimensional Family Therapy ("MDFT").

In March 2018, O.F. (then age 15) was arrested for felony vehicle theft and was found in violation of the terms of his probation (§ 777). Formal probation was again maintained. O.F. sustained another probation violation in October 2018.

By December 2018, O.F. and his mother had successfully completed the Seneca MST and Lincoln Families MDFT counseling programs.

In May 2019, O.F. (then age 16) was arrested by the Oakland Police Department for robbery, assault with a firearm, possession of a firearm, carrying a concealed firearm, possession of ammunition, and possession of a firearm by other than the registered owner. He was also arrested by the

3

Livermore Police Department for unlawful detainment, kidnapping, robbery, assault with a firearm, assault with a deadly weapon, and conspiracy, and by the Fremont Police Department for carjacking. O.F. ultimately sustained one felony count of robbery, with firearm enhancements, and in October 2019 he was ordered to be placed at Camp Sweeney, a minimum-security residential program. O.F. absconded from the camp within three days of his arrival.

A supplemental petition for probation violation was filed, and a warrant was issued for O.F.'s arrest. In January 2020, O.F. was taken into custody on the warrant, and while in custody, he was arrested for the November 23, 2019, murders of Sean Withington (age 14) and Kevin Hernandez (age 11). We now set forth the facts of those murders.

### B. The Underlying Offenses

On November 23, 2019, at approximately 1:26 a.m., Union City police officers responded to reports of gunfire near Searles Elementary School. In the school parking lot, officers found an idling van resting against a tree. The van's windows had been shattered, and all four tires were flat. Inside the van were Withington and Hernandez, both of whom had suffered multiple gunshot wounds, including shots to the head. Withington was confirmed dead at the scene; Hernandez died en route to the hospital. Both minors were "members/associates" of the Decoto XIV ("Decoto") street gang. Officers found multiple spent shell casings in the area, including 36 7.62mm x 39mm casings (commonly used by an AK-47 rifle), and six casings belonging to a 9mm firearm.

A witness reported seeing a dark four-door sedan in the driveway of the school parking lot. He also saw several muzzle flashes and thought the subject "was shooting in the air." A residential exterior camera captured footage of a silver vehicle quickly driving past the residence, with taillights

4

appearing to match those of a Toyota Camry. Another residential camera across the street from the school showed the suspect vehicle entering the parking lot and ultimately stopping in front of the victims' van before gunfire erupted. Initially, two distinct muzzle flashes were visible from the driver and passenger sides of the suspect vehicle. One muzzle flash followed the victims' van as it began to drive forward. The other, larger muzzle flashes followed the van across the parking lot. The flash illuminated the silhouette of an individual running after the van and firing.

The Union City Police Department engaged in a comprehensive investigation using physical surveillance, wiretaps, informants, and warrants for electronic data records. During the investigation, detectives obtained a rap video made by Decoto gang members that taunted and disrespected a rival gang, the Hayward Original Grip Gettas ("HOGGs"). O.F. was a known member of the HOGGs, and on November 17, 2019, he forwarded the video to a fellow HOGGs member, Jason Cornejo, who had recently posted pictures online of a Draco AK-47, which fires 7.62mm x 39mm ammunition.

The Alameda County Sheriff's Office gang unit had already been investigating O.F., Cornejo, and other known HOGGs members, including Carlos Zepeda, prior to the shootings. Both Zepeda and Cornejo were adults, and their social media accounts showed them in possession of semi-automatic firearms with a caption that read, " 'Over my brothers I'll go to war wit anybody.' " Eight days before the double murder, Zepeda informed Cornejo he would obtain a rental vehicle. Surveillance video taken four days later showed Zepeda and a friend, T.Z., renting a Toyota Camry from Reliance Autobody.

On November 22, 2019, approximately three hours before the double homicide in question, Zepeda messaged a friend and asked for " '9 shells

5

brother. . . . I need some bad [right now],' " an apparent request for 9mm ammunition. Cell phone records showed Zepeda, Cornejo, and O.F. together two hours prior to the killings.

Sixteen hours after the killings, Cornejo and O.F. engaged in a social media message exchange in which Cornejo referred to O.F. as " 'Mr. 2 shot' " and told him to pick up a friend named " 'June' " and " 'continue.' " O.F. told Cornejo to tell " 'June to do some' " and then stated " '2–0,' " an apparent reference to the double murder. When Cornejo told O.F. that he needed to " 'experience more,' " O.F. complained, " 'I could have exploded the car an u would still not be happy.' " O.F. further stated, " 'I did my shit I don't care' " and " 'I'm only gonna get better.' " Cornejo replied, " 'Love that energy,' " and he instructed O.F. to " 'be safe just chill and delete this.' "

The following day, O.F. attempted to sell a 9mm Glock firearm, but the prospective buyer became suspicious and declined. Several days later, on November 26, 2019, Zepeda's mother took the rented Toyota to a car wash to clean it. Later forensic analysis showed gunpowder residue on the passenger and driver sides of the rental. Additionally, the cell phones of O.F., Cornejo, and Zepeda remained synced to the vehicle's Bluetooth system.

A few weeks after the killings, Cornejo recorded a video of himself listening to a HOGGs member's rap song while driving through the Searles Elementary School parking lot. Cornejo zoomed in on the tree where the victims' van came to rest. Later that day, Cornejo was arrested in Union City on an unrelated matter. He was in possession of a loaded Draco AK-47 firearm that a ballistics analysis would later show was not the murder weapon but contained the same brand of ammunition used in the double homicide.

On January 11, 2020, during an intercepted telephone call between O.F. and Cornejo (in custody at the time), O.F. played a rap song produced by A.C. and told Cornejo they were mentioned in the song. Investigators believed the song referenced the double homicide at Searles Elementary School. In a later conversation, A.C. told Cornejo that O.F. wanted his moniker removed from the song because he " 'was too hot right now,' " and an edited version without reference to O.F. was later released.

On January 16, 2020, an investigator posing as a representative from Reliance Autobody contacted T.Z. to discuss the Toyota Camry. T.Z. hung up and drove to Zepeda's mother's home. Zepeda's mother called Zepeda and O.F. and asked to speak to them in person. Police questioned Zepeda's mother and later intercepted a call in which she advised O.F. to change his phone number, log out of online accounts, and " 'lay low' and 'dip away.' " O.F. asked Zepeda's mother whether " 'they know' " but she did not respond. Shortly thereafter, O.F. obtained a new cell phone and telephone number, and he deleted his social media account and created a new one.

### C. Charges

In February 2020, the prosecution filed a wardship petition under section 602 charging O.F. with two counts of murder (Pen. Code, § 187, subd. (a); counts one and two). Each count contained special allegations for personal discharge of a firearm causing death; discharge of a firearm causing death for the benefit of a criminal street gang, and multiple murder (*id.*, §§ 12022.53, subd. (d), 186.22, subd. (b), 12022.53, subd. (e), 190.2, subd. (a)(3)). The prosecution requested a section 707 hearing to transfer O.F. to criminal court.

**D. Amenability Proceedings**

Hearings on the prosecution's section 707 transfer request were held on various dates between January and November 2022.

### 1. Initial Transfer Report

In August 2020, the juvenile court received a transfer report from Deputy Probation Officer Annie Yeh recommending that O.F. be transferred to criminal court. Yeh evaluated O.F. using the five criteria set forth in section 707, subdivision (a)(3)(A)–(E), for determining whether he would be amenable to rehabilitation while under the juvenile court's jurisdiction. Yeh concluded that O.F. passed the second criterion (§ 707, subd. (a)(3)(B))— namely, whether he could be rehabilitated prior to the expiration of the court's jurisdiction—but that he failed the other four criteria (i.e., criminal sophistication; prior delinquency history; success of prior court attempts at rehabilitation; and gravity and circumstances of the offense (§ 707, subd. (a)(3)(A), (C)–(E)). Yeh concluded that O.F. was "not a fit and proper subject to be dealt with under the Juvenile Court Law" because of concerns that after his release from the California Department of Corrections and Rehabilitation, Division of Juvenile Justice ("DJJ"), he would resume a gang-entrenched lifestyle.

### 2. Yeh's Testimony

Yeh testified at the amenability hearing in February 2022. She acknowledged her August 2020 transfer report was based on outdated legal instructions that if O.F. "failed one criterion then he is to be recommended for adult court." Yeh further acknowledged that the standard had since changed and that she had not considered many of the factors set forth in section 707, subdivision (a)(3), relevant to the statutory criteria, but she adhered to her recommendation to transfer O.F. to criminal court.

8

In light of Yeh's testimony, O.F. moved for a new transfer report by a different probation officer, claiming Yeh failed to consider the relevant factors in section 707, subdivision (a)(3). The juvenile court granted the request.

### 3. Additional Transfer Reports

Deputy Probation Officer Derek Bradley submitted a new transfer report in March 2022 and an amended transfer report in April 2022.

In describing O.F.'s family and social history, Bradley remarked the parents' relationship was "marred by domestic violence, alcoholism, and infidelity." O.F. and his siblings "frequently witnessed their father's physical and verbal abuse toward their mother" and "were also victims" of his abuse. When O.F. was nine years old, his father abandoned the family. O.F. was "deeply affected" by this, and O.F.'s mother believed "his disruptive behavior was the result of his father's abandonment." O.F. was raised primarily in the home of his grandparents where he was "frequently abused by his grandfather, who suffered from addictions to alcohol, methamphetamine, and gambling." O.F. and his siblings lacked consistent supervision and were subject to general neglect.

O.F. was "exposed to gang culture at an early age, by members of his home family." He looked up to his maternal uncle, who was previously gang entrenched. At age 14, O.F. was " 'jumped in' " to the HOGGs gang and began associating with older gang members and regularly abusing drugs. O.F. explained his joining the gang "provided love that he never felt at home," and he believed "his gang affiliation, coupled with substance abuse, were the driving forces behind his increasingly criminal behavior."

O.F. regularly struggled with truancy and poor academic performance and was diagnosed with attention deficit hyperactivity disorder ("ADHD"). His teachers described him as lacking focus, confidence, and organizational

9

skills, but said he was social and well-liked. In the fifth and seventh grades, O.F. was referred to individual counseling. His disruptive behaviors, including using and selling illegal substances and wearing gang affiliated colors, continued through eighth grade and resulted in suspensions and disciplinary referrals. In 2016, the family was referred to the Parent Project with Hayward Youth and Family Services Bureau's Parent Outreach Worker, as well as substance abuse counseling at Project Eden. O.F.'s truant and negative behaviors continued into high school, and he was assessed to receive an Individualized Education Program due to learning disabilities.

After the double murder, O.F. returned to juvenile hall in January 2020. He began to focus on academics and eventually graduated from Butler Academic Center in June 2021. He underwent a psychological assessment with forensic neuropsychologist Amanda Gregory, Ph.D., who concluded O.F. was not intellectually disabled and his decision-making was on par with a typical teenager. At the time of Bradley's transfer report, O.F. was taking courses through Laney College and expressed an interest in poetry.

Like Probation Officer Yeh, Probation Officer Bradley concluded that O.F. passed the second criterion (§ 707, subd. (a)(3)(B))—whether he could be rehabilitated prior to the expiration of the court's jurisdiction—as the DJJ could retain him for approximately five years and nine months until his 25th birthday. Although O.F. had not previously shown lasting signs of rehabilitation after more than three years of probation for his past crimes, Bradley acknowledged that O.F. had previously done well in a "structured, locked facility." Bradley opined that if O.F. were to remain in such a facility, there would be "ample opportunity for [O.F.] to be fully rehabilitated within the remaining time of juvenile court jurisdiction."

10

Bradley provided many details about O.F.'s performance in rehabilitation, educational, and vocational services after his arrest for the double murder. He completed a CPR certification program; participated in legal education through Fresh Lifelines for Youth; earned certification in floor refinishing; consistently engaged in a Secondary Extended Educational Program; and "adjusted well to the rule and expectations" of juvenile hall. O.F. "frequently achieved 'Gold Level' status in his unit, based on exhibiting prosocial behavior toward staff members and peers"; was "often selected as a unit worker"; "has been one of the most well-behaved youths in his unit"; and was often relied upon "to counsel other minors in the unit regarding appropriate behavior." According to Bradley, O.F. "has done an excellent job of engaging in educational and self-improvement programs," as he "graduated from high school, started taking college courses, and completed a myriad of extra-curricular programs." Of note, O.F. received a certificate after being named Vice Youth Poet Laureate of Alameda County.

Bradley reported an incident in July 2021 when O.F. and another youth "attacked another minor in their unit" who "was from a rival gang." Afterwards, O.F. admitted he was the aggressor and expressed regret for initiating the confrontation. After O.F. and the minor he attacked participated in a private mediation to resolve their conflict, the two gang rivals became friends. A few months later in September, O.F. was involved in another altercation, but he was not the aggressor. O.F. nevertheless "apologized for his part in the altercation and reportedly became friends with the minor who attacked him." Bradley further reported that O.F. worked with and expressed gratitude to a staff member for the opportunity "to mediate with his gang rivals so that they may avoid conflicts." According to

11

Bradley, O.F.'s overall performance during his time in juvenile hall was "exceptional."

Bradley, however, failed O.F. on the other four statutory criteria for remaining in juvenile court. With respect to the first criterion (§ 707, subd. (a)(3)(A))—degree of criminal sophistication—Bradley noted that O.F. "was knowledgeable of how to obtain and correctly use ammunition and a firearm"; his participation in the execution of the murders was "indicative of a higher degree of sophistication"; and the offenses reflected a callous demeanor with a blatant disregard for the lives of others. Bradley further noted that after the murders, O.F. obtained a new cell phone, a new cell phone number, deleted social media accounts, and attempted to sell the murder weapon to "eliminate incriminating evidence."

As for the third criterion (§ 707, subd. (a)(3)(C)), Bradley described O.F.'s prior delinquency history, as well as his history of childhood trauma and abuse, and noted his offenses "continued to escalate in violence, sophistication, and severity."

With respect to the fourth criterion (§ 707, subd. (a)(3)(D))—success of prior rehabilitative efforts by the juvenile court—Bradley noted that O.F. had "great rapport with clinicians" and was "consistent and positive" in participating in services, but he continued committing crimes and victimizing the community. In Bradley's view, it was "clear" that the court's previous attempts to rehabilitate O.F. had "not been successful" and that O.F. had "not been amenable to rehabilitation efforts."

Regarding the fifth criterion (§ 707, subd. (a)(3)(E))—circumstances and gravity of the offense—Bradley found O.F.'s crimes were "of the most egregious nature," as he "helped take the lives of two young boys, firing a hail of bullets that hit both boys in the head." Bradley observed the victims "were

12

unarmed and posed no threat, yet one of the shooters even ran after the van while firing his weapon." Additionally, O.F. "demonstrated no remorse for killing the boys," and instead displayed a "very cavalier" behavior in his text messages with his co-participant in the hours following the double murder.

### 4. Bradley's Testimony

Bradley testified at the amenability hearing in May 2022. He viewed O.F.'s gang membership as both an aggravating and mitigating factor. He did not interview O.F. regarding the shootings, and he acknowledged the police report did not identify the shooters or indicate that O.F. and his co-participants planned to shoot and the kill the victims. Bradley also acknowledged the roles that adults played in the crimes: the police believed Cornejo purchased the AK47 firearm, Zepeda sought to obtain the 9mm ammunition, and Zepeda's mother cleaned the car after the crimes. Though Bradley did not know if O.F. and his co-participants "intended to kill," he concluded they knew the two victims were in the van.

Bradley testified O.F. had "a long list of mitigating factors," including domestic violence, physical abuse, substance abuse by caregivers, abandonment, neglect, exposure to trauma, and gang-entrenched family members. Bradley opined that O.F.'s delinquency was influenced by gang membership, and that older, more sophisticated negative peers exerted significant pressure on O.F. to commit crimes and make a name for himself. That O.F.'s two co-participants in the double murder were older gang members was a mitigating factor. Bradley acknowledged that teenagers do not understand the impact of their actions to the same extent as adults, and that individual counseling and gang intervention programming could help develop that insight.

13

Bradley passed O.F. on the second criterion because of his positive and consistent engagement in services while in custody. According to Bradley, O.F. had "done well" and was "one of the more well-behaved minors in the units. He's typically a worker, serves as a peer/mentor to others, participates in a lot of programming." Bradley specifically testified that O.F. has potential for growth and maturity. Not only had he participated in every program available to him during the preceding years, but he went "above and beyond" what others in juvenile hall achieved by becoming the first Vice Youth Poet Laurate in the county while in custody. Bradley believed O.F. would continue to participate in programming and engage in services in the juvenile court system.

Bradley failed O.F. on the third criterion based on the number of his prior offenses and his continued escalating criminal conduct, with several offenses involving firearms. Bradley noted that prior to his current custody, O.F. had never been sent to DJJ or a secure youth treatment facility (colloquially known as "Secure Track"), and that the most serious consequence he previously received was five months in juvenile hall in 2019, from which he was released to Camp Sweeney, an unsecured facility.

Bradley agreed that the common thread in O.F.'s criminal behavior was his gang involvement. O.F. said he wanted to leave the HOGGs gang, but Bradley did not know if O.F. knew how to do so. O.F. previously never received gang intervention programming, though recently he began receiving such programming through a program called True Academy.

Bradley failed O.F. on the fourth criterion because he did not correct his behavior after prior rehabilitative opportunities. As Bradley explained, "[w]e are looking for a shift in the mindset following his engagement in services and treatment." Bradley acknowledged that in hindsight, the

dispositions in O.F.'s prior delinquency matters that permitted him to go back home or to an unsecured placement were not the most helpful.

Finally, Bradley failed O.F. on the fifth criterion because of the severity of the offense and O.F.'s participation in it. Bradley's overall recommendation to transfer O.F. was based on O.F.'s failure to pass four of the statutory criteria.

### 5. Other Witness Testimony

#### a. Lorraine Costino

Costino testified as an expert in DJJ programs and services. She explained there is no specific gang intervention programming at DJJ, but individual counseling and DJJ's CounterPoint program addressed negative peer influence. She testified that a youth committed to DJJ for murder could generally be discharged earlier than seven years. As Costino explained, DJJ was set to close in July 2023, whereupon youths would be transferred to their committing county and enter a Secure Track commitment.

#### b. Tiffani Dyke

Dyke was a probation officer supervisor for the Alameda County Probation Department for the Secure Track program, which does not have a gang intervention program. She indicated that if the juvenile court were to order gang intervention programming for a youth in Secure Track, the probation department would find a community program or provider to offer gang intervention to that youth.

#### c. Union City Police Detective Angela Fonseca

Detective Fonseca provided further details on the subject offenses, O.F.'s subsequent criminal activity, and the HOGGs gang. Fonseca testified that Zepeda rented the Toyota used in the double murder, and that Cornejo obtained one or more of the firearms used in the shootings. There was no

evidence the suspects knew who the people in the van were before firing upon it. The van had been damaged from at least 13 gunshots, and police recovered six 9mm casings and 36 rifle casings. Ballistics analysis concluded the 36 rifle casings were fired from two different firearms, and in total, three guns were fired. Surveillance video showed the suspect vehicle driving by the front of the parked van, making a U-turn, and parking directly across from the van. The van then turned on its lights and started driving forward. There were two or possibly three muzzle flashes, including one from a suspect who was standing between the suspect vehicle and the van. The first shooter fired the most rounds and followed the van as it was driving toward the exit.

O.F. and Cornejo communicated the evening after the double murder. The conversation included O.F.'s statement, " 'I did my shit. I don't care. I'm only going to get better,' " along with Cornejo's praise in response. Cornejo added, " 'the only competition . . . is to see who gonna drop some first.' " Detective Fonseca testified the term " 'drop' " meant killing other gang members.

After the shooting, a Decoto gang member made social media posts mourning Hernandez and Withington. The letter "K" in Hernandez's gang moniker was partly made by the shape of an assault rifle. O.F. shared the post five days after the shooting.

Detective Fonseca further testified about O.F.'s involvement in numerous activities and crimes after the double homicide. On November 25, 2019, a group of about ten people including O.F. filmed a music video in which they displayed money and guns. That same day, O.F. sent social media messages asking someone if they wanted to trade "26s," meaning a Glock 26 firearm, which shoots 9mm ammunition. In O.F.'s mother's phone, there was an image of O.F. holding a firearm consistent with a Glock.

On January 9, 2020, police witnessed O.F. and Zepeda steal a Hellcat from a dealership but did not detain them. O.F., Zepeda, and another person used the stolen car to commit a burglary at a store in Vallejo on January 10, 2020. They stole several thousand dollars' worth of goods and sold them online.

On January 11, 2020, police intercepted a jailhouse call from Cornejo to O.F. in which O.F. spoke about the Hellcat theft and expressed frustration with Zepeda. The tenor of the conversation suggested that O.F. was in a leadership role over Zepeda. During the call, O.F.'s then-girlfriend Olivia played a song for Cornejo about events related to the double homicide and there was laughter between them.

On January 12, 2020, O.F. posted images of himself holding a tan-colored AK-47 or AR-15 firearm. There was circumstantial evidence that O.F. had purchased the AR-15. On January 14, 2020, O.F. was the getaway driver of an unreported stolen vehicle for an armed robbery in Hayward.

On January 17, 2020, Cornejo called O.F., who expressed frustration that he was not getting any help trying to find work. It appeared that O.F. had taken on a leadership role in terms of organizing and planning future crimes in Cornejo's absence. The following day, O.F. received a call from Zepeda's mother after police interviewed her. She told O.F. to change his phone number and get off social media. O.F. then obtained a new phone and new number and started a new social media account. On January 26, 2020, O.F. and two others burglarized a store in Vallejo and were apprehended by police. Fonseca believed that O.F. orchestrated the crime.

On February 12 and 19, 2020, police monitored calls between O.F. and Olivia. In the first call, O.F. appeared to suggest an alibi involving Olivia, and later said it was " 'hella saucy' " that he was going to beat a murder case.

In the second call, he expressed concern about the evidence and said he needed to be on his best behavior while in juvenile hall.

Social media records from early November 2019 indicated that O.F. tried to purchase a Glock 26 and a .40-caliber gun. An image shared on November 15, 2019 depicted O.F. holding a Glock case. There was no direct evidence that O.F. purchased these firearms.

Detective Fonseca testified that in the HOGGs, Cornejo was the " 'big homie' " or "shot caller" in relation to " 'lil homie' " O.F., because Cornejo was providing O.F. "instructions to go and do more work, to do more crimes." According to Fonseca, big homies teach lil homies how to be better gang members, and lil homies try to make a name for themselves. There are consequences for not obeying a shot-caller, and once you join a gang, you are expected to stay in the gang. A gang dropout can become a target of violence.

### d. Doug Ugarkovich

Ugarkovich, a juvenile justice consultant, was accepted as an expert regarding DJJ treatment services and programs and O.F.'s amenability to rehabilitation, and he submitted a suitability report to the juvenile court. He concluded that "all the objective evidence strongly points" to O.F.'s ability to "be rehabilitated within the remaining jurisdiction of the juvenile court." He based his conclusion on O.F.'s behavior pattern for the preceding 27 months, which showed his capacity to grow and mature.

In Ugarkovich's view, the probation officers' reports reflected a lack of understanding of the developmental process of an adolescent and the ability for a minor to grow and change. As Ugarkovich pointed out, O.F.'s prior treatment consisted of only two six-month outpatient programs when he was first committed for wardship at age 14 (Seneca MST and Lincoln Families MDFT), and a five-month program in juvenile hall in which he performed

18

well. At the time of his outpatient services, he had suffered significant abuse, trauma, and neglect, which "delays development." Ugarkovich testified that while the probation officers' reports mentioned O.F.'s abuse, it was not actually used as mitigation in terms of a developmental approach.

Ugarkovich opined the second criterion is the most relevant factor because the others involve static, unchanging information. In his words, "the best predictor of [whether] a youth [can] be rehabilitated . . . is Criter[ion] 2." In this regard, Ugarkovich found that O.F.'s "mind-set has changed." Specifically, O.F. is "continuing to grow and mature. His brain is not going to be fully developed for another . . . five or six years," and "as he continues to mature, . . . he's not going to be impulsive," and "peer-pressure influence is not going to be as great." Ugarkovich recounted the praise that O.F. received from juvenile hall staff and testified O.F. was "going above and beyond the rehabilitative efforts of the vast majority of the youth at this level of the legal system." Rejecting as false the assumption that the more serious the offense, the less amenable to change a youth will be, Ugarkovich explained that "the data actually points to the exact opposite. That for the more serious offenses where youth are committed to DJJ, there [are] much better public safety outcomes than for lesser offenses." But youth transferred to the adult system "are twice as likely to reoffend, and they reoffend faster and often for more serious offenses."

Ugarkovich believed beneficial services for O.F. should include trauma-informed care, programming for gang-entrenched youth, substance abuse treatment, family therapy, and continuing his education. Ugarkovich testified regarding DJJ's CounterPoint treatment for gang members and opined that Secure Track would provide the same if not better services than DJJ.

As for O.F.'s pattern of reoffending after his prior releases from custody, Ugarkovich highlighted that none of his previously completed programs was long-term or intensive. After O.F. left those programs, he went back to the same dysfunctional circumstances as before, and he did not have the skills or capacity at the time to overcome those barriers. At this point, however, Ugarkovich saw an abundance of evidence that O.F. was currently thriving under rehabilitative services. Ugarkovich observed that O.F. was benefiting from prosocial activities such as education, and that O.F. was now realizing he was worth more than he thought he was when he first came into the system. In the 27 months he had been in juvenile hall, O.F. had been trying to distance himself from his gang, and there had been no overt gang-related behaviors other than his fear of being attacked, which Ugarkovich did not see as an issue.

Ugarkovich believed O.F. would be fully rehabilitated and safe to be returned to the community sooner than the average time of 61 months. In Ugarkovich's estimation, O.F. was further along than 95 percent of the youth that he has dealt with at this level.

### e. Megan Low

Low has a master's degree in social work, and she developed a social history and psychosocial assessment report and addendum for O.F. She was accepted as an expert on whether O.F. can be rehabilitated during the jurisdiction of the juvenile court.[2]

Low described O.F.'s family environment as chaotic, stressful, and violent, with an abusive father and grandfather, and an unavailable mother. After his father abandoned the family, O.F. was left alone persistently and

---

[2] The juvenile court found Low a "way more" qualified expert than Bradley.

his uncles—who drank heavily and were gang-involved and abusive—became the adult male figures in his life.  O.F.'s first exposure to a gang was through his uncles, and he looked for love, acceptance, and support in the gang.  Throughout his childhood, he was frequently told he was stupid or bad, but he received positive feedback from older gang members.

Regarding O.F.'s flight from Camp Sweeney, Low testified that O.F. had experienced an anxiety attack and had difficulty adjusting because he was suddenly without the staff with whom he had formed strong relationships.  After leaving the camp, he was essentially homeless, and he started using substances as a way to cope.  The longest continuous period of substance abuse treatment he had was when he was incarcerated on the petition that brought him to the camp—a 12-week program with La Familia.  Low testified that relapsing after substance abuse treatment does not mean the treatment is a failure, because recovery is a process, and relapsing is common.

Low testified that in spring 2020, O.F. became more open to school and programming.  His attitude was positive, he was on "Gold Status," and he made academic progress.  He went from thinking he was a bad student to doing exceptionally well, earning his high school diploma, and starting college.  He participated in voluntary programs and self-improvement programs and went "above and beyond" what was required.  In Aggression Replacement Training ("ART"), he shared many things that were difficult to talk about, which is rare for male adolescents.

In the youth poet laureate competition, O.F. had to participate in a live video interview with a panel of judges comprised of Alameda County department heads and local poets.  He was selected as one of five finalists and performed an original poem in front of the judges panel.  He was

awarded the title of Vice Youth Poet Laureate of Alameda County and later performed an original poem at a public event that was broadcast in every housing unit in juvenile hall.

Low further testified about O.F.'s involvement in restorative conflict resolution. In one incident, a youth affiliated with a rival gang was placed in O.F.'s housing unit. O.F. approached the youth and had a conversation, and they were friendly and cooperative with each other. In another incident, there was a fight where O.F. was the aggressor, but afterwards, he and the youth engaged in conflict resolution and became friends. After that incident, O.F. never initiated another fight.

Low testified that O.F. expressed for over two years that he does not want to be in a gang anymore, and he was "also very clear that he requires a lot of support to help him do that." Working with mentors who have exited their gangs gave him optimism about his ability to leave. Low testified that O.F. needs gang intervention services, which can be provided through programs, mentoring, and other prosocial activities including employment and education. Low did not consider O.F. to be fully rehabilitated and stated he is "still very much in the middle or even beginning phase of his process" because "[h]e has not been offered the full gang intervention programming that I think is available to him in juvenile hall," and requires more individual and family therapy.

### f. Leonardo Guzman

Guzman developed True Academy, a program that combines restorative practices with cognitive behavioral therapy and assists with career development and training. The gang intervention curriculum was "built on identifying healthy relationships," and one of the program's facilitators, who

was formerly gang-entrenched, brought his expertise about the risks of being in a gang.

True Academy started working with youth in juvenile hall in November 2021. Guzman testified that O.F. joined True Academy in November 2021 and participated in all seven of the one-and-a-half-hour group sessions before the program was suspended due to the COVID-19 pandemic. Guzman described O.F. as focused, goal-oriented, and one of the most mature youth in the program. He showed leadership and set an important tone for the group.

### g. Other Defense Witnesses

Byrne Sherwood, a juvenile detention center chaplain, testified positively about O.F.'s growth, development, introspection, and remorse.

Therapist Dennis McCollins was the facilitator and behavioral clinician for True Academy and described O.F. as very engaged and "the most consistent participant."

Alex Diaz was the program manager for Rites of Passage and had been working with O.F. for about three months, addressing his harmful experiences, traumas, and struggles. Diaz, a former gang member, developed a plan for O.F. to overcome his challenges, including work with community members, gang relations, building and strengthening relationships, and reinforcing positive thinking patterns.

Francis Guzman, a youth justice attorney and former gang member, similarly testified that O.F. would have a better chance to separate from the gang lifestyle in juvenile hall rather than prison. He remarked positively about O.F.'s honesty about his experiences, behavior, motivations, and desire to change.

Dr. Gregory conducted a psychological assessment of O.F. and submitted a report to the juvenile court. Her main findings were diagnoses of

ADHD, residual symptoms of conduct disorder (e.g., aggressive, destructive behavior, stealing, rule violations), substance abuse disorder, and post-traumatic stress disorder ("PTSD"). Dr. Gregory believed O.F.'s conditions were treatable with cognitive behavioral therapy, group settings, reducing the anxiety associated with triggers, and having prosocial mentors.

O.F.'s PTSD stemmed from a long history of exposure to traumatic events, including witnessing domestic violence, being physically abused, separation from his father, and exposure to community violence, including a shooting incident in which his friend was hit and O.F. was grazed. And, Dr. Gregory explained, O.F. experienced a significant deterioration in his emotional state after his father left, leaving O.F. "at particular risk for being easily influenced by those around him."

Dr. Gregory testified that O.F.'s mental health symptoms were lessening, and that he no longer met the diagnostic criteria for adolescent onset conduct disorder. Having more structure, consistent treatment over the past two years, engaging in rehabilitation programs, and being motivated in school contributed to his improvement. In Dr. Gregory's view, the outpatient interventions O.F. previously received were not as intensive as his current treatments, and the custodial nature of the current treatments were superior to outpatient therapy. As Dr. Gregory noted, O.F. was seeking to have a gang element on his hand removed.

Laney College faculty member Roger Chung testified that O.F. was taking college courses that were transferable to the Cal State and University of California systems, and that O.F.'s 4.0 GPA made him automatically eligible to be considered for acceptance.

### 6. *Victim Impact Statements*

During the amenability hearing, the prosecution sought to admit victim impact statements into evidence. O.F.'s counsel objected on the grounds that the statements could only be submitted to the probation officer, who would then decide whether to include them in the transfer report. The juvenile court considered the objection, conducted further research, and offered to put the case over to allow the probation officer to incorporate the statements in the transfer report, but O.F.'s counsel declined. The court admitted the impact statements into evidence.

### 7. *Juvenile Court's Decision*

On the final day of the amenability hearing, November 2, 2022, the juvenile court announced its decision to grant the transfer motion. The court also issued a 12-page written decision memorializing its rationale, stating it was required to consider the five criteria set forth in section 707 and had "broad discretion in applying them." The court further acknowledged it had "to find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" in order to transfer O.F. to criminal court.

The juvenile court found the first statutory criterion—degree of criminal sophistication (§ 707, subd. (a)(3)(A)(i))—weighed in favor of transfer. In the court's view, O.F. showed "a sophistication well beyond his age," and despite having a "low average" I.Q. he was not intellectually disabled. The court acknowledged O.F.'s traumatic childhood and "severe substance abuse issues" played a role in his behavior and noted "he mostly associated with adults, including the two co-participants in the present offense," who taught him "to think and behave criminally." The court further observed that O.F. was the subject of previous petitions for firearm offenses,

including the offense that led to his placement at Camp Sweeney in October 2019, but he absconded from the camp and "decided to hang out with fellow gang members and consume alcohol, use cocaine, and take Oxycodone pills." The court also highlighted that after the murders, O.F. tried to sell a 9mm firearm, replaced his cell phone and telephone number, deleted his social media accounts, and "went to a 'trap' house where weapons and other contraband are hidden." He "showed no remorse and continued to commit crimes, stated that he 'did his shit' and that he 'don't care' about taking the two young lives." He "further stated that he 'was only going to get better,' which indicates that he was going to commit more crimes, which he did." Before his arrest for the double murder, he stole a car to commit a burglary and then sold the stolen items. He also bought an AR-15 firearm and "was involved in a robbery," and complained to a co-participant that "he was not getting more 'work.' " Meanwhile O.F. attempted to establish an alibi with his girlfriend and then changed his story after "he understood his situation and exposure and what he believed was necessary to try to stay in juvenile court."

In contrast to the probation department and expert witnesses, the juvenile court found the second criterion—whether the minor can be rehabilitated prior to the expiration of the court's jurisdiction (§ 707, subd. (a)(3)(B)(1)—also favored transfer. The court first noted that since DJJ was set to close, a decision against a transfer would mean that O.F. would participate in programming through Secure Track, and that given his age, O.F. would have approximately 5 years and 2 months until the age of 25 when he would have to be released. The court found that Secure Track offered adequate services to address each of his treatment needs (e.g., secure placement, mental health treatment, substance abuse and relapse treatment,

and gang intervention counseling). The court then noted the evidence that weighed against a transfer: Ugarkovich's testimony based on O.F.'s recent treatment engagement and progress that he was amenable to and benefiting from juvenile rehabilitation services; the fact that O.F. "has generally performed well while in custody" and that his "behavior and compliance have been praised by Juvenile Institutional Officers"; and O.F.'s academic and other achievements, including earning his high school diploma and being named a Vice Youth Poet Laureate for Alameda County. But citing Low's testimony that O.F. was "still at the beginning towards middle phase of his process" and that "consistent interventions will be needed around gang involvement," the court then concluded that O.F. "has not demonstrated that engaging in treatment programming has produced the desired shift in his mentality that would enable the minor to be safely maintained in the community." As an example, the court cited the July 2021 incident in juvenile hall when O.F. and another youth attacked a youth from a rival gang. Though agreeing with Guzman that fights in juvenile hall are not uncommon, the court found it "telling that this fight occurred after [O.F.] completed the [ART] Program" and only "weeks after he was baptized, received his high-school diploma, and right after meeting with Ms. Low." The court also acknowledged that O.F. "and the other youth worked it out through mediation and [O.F.] was remorseful for his actions," but in the court's view, the incident reflected "the same pattern as in previous petitions," namely, O.F. "commits a criminal act, feels remorseful, engages in services, gets pulled back into the gang lifestyle and commits another crime." The court "disagree[d] with the probation department's assessment that [O.F.] passes the second [criterion]" and concluded he could not be rehabilitated prior to the expiration of jurisdiction.

The juvenile court next found the third criterion—minor's previous delinquent history (§ 707, subd. (a)(3)(C)(i)—also weighed in favor of transfer. The court listed nine events from O.F.'s delinquency history going back to January 2017, including his admission in October 2019 to one felony count of robbery with firearm enhancements. The court noted that on October 28, 2019, O.F. was placed at Camp Sweeney but soon absconded. The court found that O.F.'s history " 'depicts a pattern of offenses that have increased in severity and sophistication from misdemeanor assault to the ultimate crime of murder.' " He "was raised in an environment where violence was common, but positive role models were not." He "has been entrenched in the criminal street gang HOGGS . . . since he was 14 years old. Despite his understanding that his fellow gang members were not true friends and his stated intentions to leave the gang life, he always got drawn back to the gang and into criminal behavior whenever he was in the community." While the court found O.F.'s trauma and mental health concerns to be valid, it noted that O.F. "continued to victimize members of the community instead of using the tools and services available to him to address these issues."

The juvenile court found the fourth criterion—success of previous attempts by the court to rehabilitate the minor (§ 707, subd. (a)(3)(D)(i))—to likewise support transfer. The court set out the history of O.F.'s services, including on-campus counseling, family counseling, substance abuse counseling, formal probation, a six-month MST program, and a nine-month MDFT program. Despite O.F.'s positive engagement throughout these services, his "criminal activity continued in the community." The court noted that one month before the murders, O.F. said "he would make positive changes in his life if the Court would allow him to be placed at Camp

28

Sweeney." He told the juvenile court that he was "motivated to improve his behavior for his mother and infant half-sister," that he recognized gang members were not true friends, and that he "wanted to focus on graduating from high school, going to college, and being a positive role model to his sister." The court noted that at Camp Sweeney, O.F. had been "afforded individual counselling services, family counseling services, vocational and academic education, and substance abuse counseling," but he absconded less than three days after his arrival, failing to "engage, much less complete, the program he requested to attend to change his life for the better." He "has established a pattern of performing well within the confines of Juvenile Hall, but continuing to victimize members of the community, once released from the locked facility."

The juvenile court found the fifth and final section 707 criterion—the circumstances and gravity of the alleged offense (§ 707, subd. (a)(3)(i))— weighed in favor of transfer. As the court expressed, "[m]urder is the ultimate harm, it is irreversible, permanent, and is devastating to the victim's loved one, their friend, and to the community." The court further found that the crimes were senseless, that O.F. remained unremorseful, and that the impact was "immeasurable." He "helped take the lives of two young boys, firing a hail of bullets that hit both victims in the head."

In view of its decisions on the five statutory criteria, the juvenile court concluded the People met their burden of proof "by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." The court accordingly ordered O.F.'s transfer to criminal court. O.F. timely appealed.[3]

---

[3] During the pendency of this appeal, O.F. requested that we take judicial notice of his academic records, including transcripts from 2021 to

29

## DISCUSSION

### A. Legal Framework

When a minor age 16 or older is alleged to have committed a felony, the prosecution may move to transfer the minor to criminal court. (§ 707, subd. (a)(1).) Upon the motion, the juvenile court must order the probation officer to submit a report on the minor's "behavioral patterns and social history." (*Ibid.*) The parties may submit "other relevant evidence" in connection with the transfer motion. (*Id.*, subd. (a)(3).)

In determining whether to transfer a minor to criminal court, the juvenile court "shall consider the criteria specified in subparagraphs (A) to (E)" of section 707, subdivision (a)(3). (§ 707, subd. (a)(3).) These criteria are: (1) "[t]he degree of criminal sophistication by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "[t]he minor's previous delinquent history"; (4) the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(A)(1)–(5).) The weight to be given each of the five criteria is within the juvenile court's discretion. (*D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 445 (*D.C.*).)

Section 707 also sets forth a nonexhaustive list of "factor[s]" relevant to each of the five criteria. For the first criterion (criminal sophistication) the relevant factors include "the minor's age, maturity, intellectual capacity, and

2025 and a letter from the U.C. Berkeley, Underground Scholars program. We deferred ruling on the motion pending our consideration of the merits of the appeal, and we now deny the request on the ground the exhibits are not proper subjects of judicial notice (Evid. Code, §§ 451, 452), as they relate to post-appeal matters without a showing of compelling circumstances to consider them for the first time on appeal (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3).

30

physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (§ 707, subd. (a)(3)(A)(ii).) For the second criterion (whether minor can be rehabilitated prior to expiration of jurisdiction), the relevant factors include "the minor's potential to grow and mature." (*Id.*, subd. (a)(3)(B)(ii).) For the third criterion (previous delinquency history), the factors include "the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (*Id.*, subd. (a)(3)(C)(ii).) For the fourth criterion (success of previous court attempts at rehabilitation), the relevant factors include "the adequacy of the services previously provided to address the minor's needs." (*Id.*, subd. (a)(3)(D)(ii).) For the fifth criterion (circumstances and gravity of alleged offense), the relevant factors include "the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." (*Id.*, subd. (a)(3)(E)(ii).)

At the time of O.F.'s amenability hearing in 2022, the governing law required the prosecution to establish by a preponderance of the evidence that the minor should be transferred to criminal court. (Former § 707, subd. (a)(3).) Effective January 1, 2023, AB 2361 amended section 707 to state that "[i]n order to find that the minor should be transferred to a court of

31

criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3), as amended by Stats. 2022, ch. 330, § 1.) "This changed the finding a juvenile court must make before ordering a transfer in two ways: (1) raising the standard of proof; and (2) requiring a new specific finding regarding amenability to rehabilitation." (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1284 (*S.S.*).) AB 2361 also amended section 707 to require the court to "recite the basis for its decision in an order" that includes "the reasons supporting the court's finding that the minor not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3), as amended by Stats. 2022, ch. 330, § 1.)

Rule 5.770 was amended, effective September 1, 2023, to comport with these changes. It provides in relevant part: "Following receipt of the probation officer's report and any other relevant evidence, the court may order that the youth be transferred to the jurisdiction of the criminal court if the court finds *by clear and convincing evidence each of the following*: (1) The youth was 16 years or older at the time of any alleged felony offense . . . ; *and* (2) The youth should be transferred to the jurisdiction of the criminal court based on an evaluation of all the criteria in section 707(a)(3) as provided in that section; *and* (3) The youth is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Rule 5.770(b), italics added.) Rule 5.770(c) further requires a juvenile court ordering transfer to "state on the record the basis for its decision, including how it weighed the evidence and identifying the specific factors on which the court relied to reach its decision."

Another change in the law subsequent to the transfer decision in this case pertains to the juvenile court's consideration of the factors relevant to each of the five statutory criteria. The former version of the statute made

32

consideration of those factors discretionary, not mandatory. (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164–165 (*Miguel R.*).) Effective January 1, 2024, SB 545 amended the statute to require that with respect to each of the five criteria, the juvenile court "shall give weight to" the statutory factors listed as relevant to each criterion. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)

"We review the juvenile court's ruling on a transfer motion for abuse of discretion." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) The lower court's findings of fact are reviewed for substantial evidence, its conclusions of law de novo, and its application of the law to the facts is reversible only if arbitrary and capricious. (*Ibid.*) The court's ultimate finding that the minor is not amenable to rehabilitation while under its jurisdiction is also reviewed for substantial evidence. (*Ibid.*) "In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Ibid.*)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 (*O.B.*).) The clear and convincing evidence standard " 'requires a finding of high probability.' " (*Id.* at p. 998.) The evidence must be " ' " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*Id.* at p. 998, fn. 2.)

**B. Retroactivity**

There is no dispute that because this case is not final, O.F. is entitled to the benefits of the changes to section 707, subdivision (a)(3), enacted by AB 2361 and SB 545. (See *In re J.M.* (2024) 103 Cal.App.5th 745, 753.) Notably,

the court here anticipated the retroactive effect of AB 2361 and stated the higher burden of proof both in its oral remarks on the final day of the amenability hearing, and in its written transfer decision.[4]  The court also made the independent finding required under AB 2361 that O.F. was not amenable to rehabilitation while under the court's jurisdiction.

As for SB 545 and rule 5.770, these changes in the law became effective well after the transfer decision in this case.  While the nonexhaustive list of relevant factors within each of the five criteria at subparts (A)(ii), (B)(ii), (C)(ii), (D)(ii), and (E)(ii) of section 707, subdivision (a)(3), existed at the time of the proceedings below, the juvenile court repeatedly stated that it "may" give weight to them, reflecting the merely permissive language of pre-SB 545 law.  Moreover, as we discuss more fully below, the court's analysis does not indicate it gave weight to several of the now-mandatory factors relevant to each of the statutory criteria.  Thus, remand is required for the court to make an amenability determination that comports with current law.

**C. Amenability Analysis**

The recent amendments to section 707 have led to a "renewed focus on rehabilitation" of delinquent minors.  (*S.S.*, *supra*, 89 Cal.App.5th at p. 1287.) " '[C]ognitive science has proven that children and youth who commit crimes

---

[4]     O.F. argues that despite the juvenile court's oral remarks, the record suggests the court failed to apply the changes enacted by AB 2361 because the November 2, 2022, minute order and signed transfer order on Judicial Council form JV-710 articulated the preponderance of the evidence standard. O.F. argues the general rule that a trial court's oral pronouncements control over inconsistent minute orders does not apply here; rather, the written and signed transfer order controls.  (See *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756, fn. 1.)  But as we have explained, the court identified the heightened standard of proof not only in its oral remarks but also in its written statement of decision, which together are more strongly reflective of the court's intent than its ministerial use of a pre-AB 2361 order form.

are very capable of change.' " (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 92.)  "Rehabilitation is the way forward, and that includes giving juveniles who have made a mistake the opportunity to create a new future as they prepare to reenter our society as adults." (*S.S.*, at pp. 1285-1286.)  Thus, a minor's amenability to rehabilitation is the central and "dispositive" question in proceedings under section 707 (*S.S.*, at p. 1286), and the juvenile court's analysis of the section 707 criteria must be "focused through the lens of amenability to rehabilitation" (*S.S.*, at p. 1288).  The heightened standard of proof applies throughout this analysis (see rule 5.770(b)), reinforcing the important policy of maintaining youth offenders in the juvenile court system when the evidence of their resistance to rehabilitation is less than clear and convincing.

Section 707 and rule 5.770 do not define the term "amenable to rehabilitation."  Given this omission, "we look to the plain language" of the phrase "as understood by the ordinary person, which would typically be a dictionary definition." (*People v. Johnson* (2020) 50 Cal.App.5th 620, 633.) Amenability is defined as "having or showing willingness to agree or to accept something that is wanted or asked for," while rehabilitation is defined as "the process of restoring someone (such as a criminal) to a useful and constructive place in society."[5]  Thus, the ultimate question presented in this case is whether clear and convincing evidence supports the juvenile court's conclusion that O.F., while under the court's jurisdiction, is not willing to accept treatment that would restore him to a constructive place in society.

---

[5]     See Merriam-Webster Dict. Online (2026) <https:/www.merriam-webster.com/dictionary/amenable> (as of March 13, 2026); <https:/www.merriam-webster.com/dictionary/rehabilitation> (as of March 13, 2026).

On this score, we observe the record contains abundant and uncontroverted evidence of O.F.'s willingness to engage in the services and therapeutic interventions available to him in juvenile hall. Every witness at the amenability hearing who personally knew O.F., including Probation Officers Yeh and Bradley, praised his efforts and remarked positively about his consistent engagement and participation in treatment at juvenile hall, as well as his potential for growth, reflection, and maturity. O.F. showed a strong rapport with clinicians and developed prosocial relationships. He developed an aptitude for poetry, became committed to his academic progress, and is well on his way to earning a college degree. All witnesses agreed that O.F. has "gone above and beyond" what other youths in juvenile hall achieved. And critically, O.F. maintained this behavior steadily during his more than two years in juvenile hall prior to the transfer decision. No witness suggested O.F. lacked sincerity or commitment to his rehabilitation.

Notwithstanding the above, the juvenile court concluded O.F. was not amenable to rehabilitation while under the court's jurisdiction after finding all five of the statutory criteria weighed in favor of transfer. Accordingly, we turn to the court's analysis of the statutory criteria.

### 1. *Second Criterion*

"[T]he ultimate determination of whether 'the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court' [citation] is not the same as the second criterion, which calls for consideration of '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' [citation]. . . . [T]he focus of the second criterion is whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 166–167.) When evaluating this criterion, "the

36

juvenile court shall give weight to . . . the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).)

At the time of the transfer decision in November 2022, O.F. had five years and two months in the juvenile court system. This was not an insignificant amount of time, and all the testimony at the amenability hearing, including that of the probation officers, was that there was sufficient time for O.F. to be rehabilitated. While we do not suggest the juvenile court was compelled to defer to probation, the court's finding that O.F. was incapable of rehabilitation before the expiration of jurisdiction still required support by clear and convincing evidence. (Rule 5.770(b)(2).) We conclude the evidence cited by the court was not so clear and convincing as to leave no substantial doubt as to the court's ultimate finding on the second criterion. (*O.B.*, *supra*, 9 Cal.5th at p. 998.)

In support of its finding, the juvenile court relied on a small portion of Low's testimony in which she stated that O.F. was "still at the beginning towards middle phase of his process." This was in response to a question as to whether Low considered O.F. to already be "fully rehabilitated," a level of progress not required under section 707 to maintain a youth in juvenile court. Low said she did not consider O.F. to be fully rehabilitated at that point because he had "not been offered the full gang intervention programming" that she believed was available to him in juvenile hall. Indeed, when asked if she thought O.F. could be rehabilitated by age 25, Low said yes because "he has engaged in an honest, meaningful process toward rehabilitation," and "[h]is willingness and motivation, which he has demonstrated over the last two and a half years and certainly demonstrated in his meetings with me, indicate that he would continue that process if he remains in the juvenile court system." Thus, Low's ultimate opinion on the second criterion was that

there was sufficient time to rehabilitate O.F. in the juvenile court system. That she viewed him to be in the early phases of the rehabilitative process because he had "not been offered" full gang intervention programming (because the True Academy program first started in November 2021 before it was suspended during the COVID-19 pandemic) in no way suggested he could not be rehabilitated with an additional five years of full programming.

The People emphasize that a juvenile court does not abuse its discretion by disagreeing with a defense expert and instead relying on other evidence. (*In re J.S.* (2024) 105 Cal.App.5th 205, 212.) We have no quarrel with that general proposition, but the court here did not disagree with Low or rely on contrary evidence. Rather, the court remarked positively about her expert qualifications on the second criterion and relied on her testimony throughout its decision, and the People presented no expert contradicting her. Given the Legislature's refocusing of section 707 on a minor's amenability to rehabilitation, expert testimony "will likely be necessary," and the testimony of experts that the minor can be treated " 'is entitled to great weight in the court's ultimate determination.' " (*S.S., supra,* 89 Cal.App.5th at pp. 1286–1287.) In relying on a snippet of Low's remarks to the exclusion of her ultimate opinion, the court did not give "great weight" to the most critical aspect of her expert testimony.

The juvenile court also cited the amended transfer report in which Probation Officer Bradley described O.F.'s attack on a youth from a rival gang in July 2021. The court cited this evidence as emblematic of a pattern in which O.F. offends, feels remorseful, engages in services, but "gets pulled back into the gang lifestyle and commits another crime." But in determining whether this evidence contributes to the clear and convincing threshold, we must view it in its full context. What stands out about the July 2021 fight is

not so much that it happened, as several witnesses including Bradley acknowledged that fights among youth in custody are not uncommon. Rather, the incident is particularly notable for how it resolved: O.F. admitted fault, engaged in meaningful reconciliation with the other youth, and the two "became friends in the unit." While it was regrettable that O.F. started the fight in the first place, it is difficult to envision a better demonstration of his progress than his ability to reconcile with and befriend someone from a rival gang. It is also noteworthy that the fight occurred 16 months before the transfer decision, and the record reflects no further acts of aggression initiated by O.F. Rather than leaving no substantial doubt that O.F. cannot be rehabilitated within the remainder of the juvenile court's jurisdiction, the evidence, when viewed in context and as a whole, uniformly suggests O.F. has the potential to overcome his gang roots before jurisdiction expires.

Indeed, it is the "potential" for minors to grow and mature, notwithstanding their prior delinquent conduct, that is relevant to the juvenile court's evaluation of the second criterion. (§ 707, subd. (a)(3)(B)(ii).) Here, the juvenile court cited O.F.'s past conduct (e.g., his reoffending after prior services and his instigating the July 2021 fight) in concluding that although he had performed well in custody, he "is not rehabilitated" and his treatment to date "has not produced the desired shift in his mentality." In evaluating the second criterion, the court made no reference to any of the evidence of O.F.'s potential to progress beyond where he was at the time of the hearing, including the uncontradicted testimony from both Probation Officers Yeh and Bradley of O.F.'s demonstrated capacity to mature and grow; Dr. Gregory's testimony that O.F. showed marked improvement in his mental health symptoms (including no longer meeting the diagnostic criteria for adolescent onset conduct disorder); and abundant other evidence about

39

O.F.'s behavior and performance while in custody demonstrating his efforts to overcome the influence of gangs.[6]

In sum, we conclude the juvenile court's decision on the second criterion was in error. As the record reflects, the court appeared to give no weight to the uncontradicted expert and lay testimony of O.F.'s demonstrated potential for growth and maturation while in custody and his ability to be rehabilitated prior to the expiration of the juvenile court's jurisdiction. Moreover, its conclusion that O.F. was not willing to accept treatment that would restore him to a constructive place in society was not supported by substantial evidence meeting the requisite clear and convincing threshold. (§ 707, subd. (a)(3)(B)(ii); rule 5.770(b).)

### 2. *Third and Fourth Criteria*

On the third criterion, the juvenile court found that O.F. had an extensive delinquency history from age 14 to age 16, with numerous offenses involving firearms and crimes of escalating severity, and notwithstanding his completion of court-ordered counseling programs (e.g., six months of Seneca MST and nine months of Lincoln Families MDFT). The court considered O.F.'s childhood trauma of abuse, neglect, and abandonment, his mental health issues, and the violent environment in which he was raised, but found in spite of these mitigating factors that O.F. "continued to victimize members of the community instead of using the tools and services available to him to address these issues." The court further emphasized O.F.'s attraction to gang

---

[6]    For instance, on the same page of the amended transfer report describing the July 2021 fight, Probation Officer Bradley described the September 2021 fight, which O.F. did not instigate, but for which O.F. nevertheless apologized before befriending the youth who attacked him. The amended transfer report further notes that O.F. worked in other ways "to mediate with his gang rivals so that they may avoid conflicts." This is unmistakable evidence of O.F.'s potential to grow and mature.

40

culture and his repeated return to "the gang [life] and into criminal behavior whenever he was in the community." As to the fourth criterion, the court similarly concluded that despite O.F.'s positive engagement in prior services, his "criminal activity continued in the community," and he "has established a pattern of performing well within the confines of Juvenile Hall, but continuing to victimize members of the community, once released from the locked facility." We conclude the juvenile court's analysis is lacking in several critical respects.

Although the juvenile court appropriately gave weight to the effect of O.F.'s family and community environment on his delinquency history (§ 707, subd. (a)(3)(C)(ii)), the record does not reflect that the court viewed the effect of gang influence on O.F. "through the lens of amenability to rehabilitation." (*S.S.*, *supra*, 89 Cal.App.5th at p. 1288.) It is likely no coincidence that the timeline of O.F.'s delinquency aligns so closely with his time in the HOGGs gang. To the extent O.F.'s gang ties entrapped him in a cycle of reoffending after engaging in services, the pertinent questions regarding his amenability to rehabilitation are whether he can sever those ties, and whether he has been given adequate services to learn to do so. The court's analysis did not reflect consideration of whether O.F.'s services to date provided him with adequate gang intervention treatment to address the ostensible root cause of his delinquency.

Notably, the record suggests O.F. had not received adequate gang intervention treatment at the time of the amenability hearing. He received no gang intervention services as part of the dispositions of the prior delinquency matters before the instant case, and Ugarkovich testified that none of the programs O.F. previously participated in were sufficiently long-term or intensive to meet his needs. Low similarly testified at the

41

amenability hearing that O.F. had not yet been offered the full gang intervention programming available to him in juvenile hall. The only gang intervention programming that was available to O.F. was True Academy, in which he began participating as soon as it started in November 2021, only for the program to be suspended at the time of the amenability hearing.

For the above reasons, we instruct the juvenile court on remand to reassess the third and fourth criteria by weighing the effect of gang influence on O.F.'s previous delinquent behavior (§ 707, subd. (a)(3)(C)(ii)) and the adequacy of the gang intervention services provided to him (*id.*, subd. (a)(3)(D)(ii)), all with a view towards assessing his amenability to rehabilitation.

### 3. First Criterion

In assessing the degree of criminal sophistication exhibited by a minor, the juvenile court "consider[s] the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime." (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 683–684 (*Jones*).) Criminal sophistication can be shown with facts demonstrating an " 'ability to appreciate the risks and consequences of [one's] criminal behavior' and [one's] awareness 'of the wrongfulness . . . of [one's] conduct.' " (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 193.) The court may also consider post-offense events in evaluating a minor's criminal sophistication. (*D.C.*, *supra*, 71 Cal.App.5th at pp. 452–455.) The court "shall" give weight to factors such as "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family

and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (§ 707, subd. (a)(3)(A)(ii).)

As discussed earlier, the juvenile court found O.F. was criminally sophisticated "beyond his age" due to his history of firearm offenses; his attempt to dispose of evidence from the double murder (e.g., trying to sell the 9mm firearm, obtaining new cell phone and telephone number, deleting his social media account); his act of hiding in a " 'trap' " house the day after the killings; his text messages reflecting callousness and lack of remorse over the killings; and his continued commission of crimes, including vehicle theft and robbery. The court appropriately considered O.F.'s traumatic childhood and substance abuse as mitigating factors, while additionally remarking that O.F. "mostly associated with adults, including the two co-participants in the present offense," who taught him "to think and behave criminally."

But what is missing from the juvenile court's analysis of O.F.'s criminal sophistication is adequate consideration of the effect of adult or peer pressure (§ 707, subd. (a)(3)(A)(ii)), with a view towards O.F.'s amenability to rehabilitation. It is unclear from the court's remarks whether it viewed O.F.'s training by adult gang members to be mitigating or aggravating on the first criterion. (See rule 5.770(c) [juvenile court must state on record how it weighed the evidence and identify the specific factors on which it relied].) On the one hand, such training may reflect that O.F. became criminally sophisticated at an adult level. But on the other, it calls attention to Dr. Gregory's observation that O.F. was "at particular risk for being easily influenced by those around him." The court must consider O.F.'s amenability

to rehabilitation if those negative adult influences can be excised from his life and replaced by prosocial ones.

The juvenile court also found that O.F.'s criminal sophistication was demonstrated by his lack of remorse after the double murder. In support, the court highlighted O.F.'s remarks that he " 'did his shit' "; that "he 'don't care' "; and "he 'was only going to get better.' " Assuming for the sake of argument that lack of remorse bears on a minor's criminal sophistication, the court must still consider the fact that O.F. made these remarks to Cornejo, an adult HOGGs member and "big homie" who instructed O.F. to commit his crimes. In that same conversation, O.F. sought approval from Cornejo, who praised O.F. for his "energy" in wanting to commit more crimes. To view the first criterion through the lens of amenability of rehabilitation requires recognizing that O.F. sought acceptance from adult gang members after a childhood of abuse, abandonment, and neglect. The double murder in question was gang-related and committed with adults in his gang, and O.F.'s remarks, albeit callous and remorseless, are also consistent with wanting to please them. Whether O.F.'s remarks reflected criminal sophistication should be made with consideration of his youthful desire for approval from the influential adults in his life.

The juvenile court also found that O.F. demonstrated criminal sophistication when he attempted to dispose of evidence after the double murder. Though the record reflects that O.F. tried to sell a 9mm firearm the day after the murders, his attempt to eliminate evidence by obtaining a new cell phone, telephone number, and social media account were, as far as we can ascertain, undertaken in January 2020 after Zepeda's mother called O.F. and instructed to do so following her interview by police. If O.F. did not think to dispose of this evidence until an adult told him to do so, months after the

44

November 2019 double murder, this would tend to lessen the level of criminal sophistication attributable to O.F.

Accordingly, we instruct the juvenile court on remand to reassess the first criterion by giving weight to all relevant factors, including those set forth in section 707, subdivision (a)(3)(A)(ii)), with a view towards O.F.'s amenability to rehabilitation.

### 4. Fifth Criterion

We have no difficulty appreciating the juvenile court's recognition of the gravity of the double murder in question. The tragedy of these crimes cannot be overstated, especially given the ages of the victims. But the gravity of the offense is not dispositive, and the fifth criterion also calls for consideration of the "circumstances" of the offense. On this score, section 707, subdivision (a)(3)(E)(ii), requires that weight be given to "the actual behavior of the person," "the person's degree of involvement in the crime," and "the level of harm actually caused by the person." We conclude the court's analysis is lacking in several critical respects.

The juvenile court reasonably found the murders were "senseless" and "egregious," the impact was "immeasurable," and O.F. was involved yet unremorseful, but it appears the court did not evaluate the state of the evidence (including any gaps therein) regarding O.F.'s actual behavior, degree of involvement, and the level of harm actually caused by him. Instead, the court remarked that O.F. "helped take the lives of two young boys, firing a hail of bullets that hit both victims in the head," even though there was no direct or circumstantial evidence that O.F. actually fired a gun during the incident. Moreover, other evidence suggests the AK-47 was obtained by Cornejo; the 9mm ammunition was obtained by Zepeda; and the rental vehicle was obtained by Zepeda and another adult. This is not to

suggest the evidence could not support transfer under this criterion, but the court's analysis should reflect more nuanced consideration of the state of the evidence regarding O.F.'s actual behavior, degree of involvement, and the harm actually caused by the minor.

To the extent the People suggest the juvenile court was permitted to assume unproven facts about O.F.'s behavior and involvement in the offenses in evaluating the fifth criterion, they are mistaken. The People rely on a statement in *Jones, supra,* 18 Cal.4th 667, that an amenability determination is "based on the premise that the minor did, in fact, commit the offense." (*Id.* at p. 682.) But *Jones* was explaining that "[a] minor charged with committing one of the specified offenses is not required to establish innocence in order to show amenability to the juvenile court system. 'Whether the youth committed the act alleged in the petition is not the issue in [an amenability hearing]; the sole question is whether he would be amenable to treatment in the event that he is ultimately adjudged a ward of the court.' [Citations.] Indeed, the criteria used to determine fitness are based on the premise that the minor did, in fact, commit the offense." (*Ibid.*)

In other words, *Jones*'s point was that the focus of the transfer inquiry must be on a minor's amenability to treatment, not on proving or disproving the allegations of the charging petition. But this does not suggest the court should make broad assumptions about a minor's guilt without consideration of the particular state of the evidence. Indeed, *Jones* goes on to state that "the minor may use the information contained in police reports, the probation report, expert evaluations, and other submissions to the court 'to argue that his participation was not as grave or serious as the charge would initially lead a court to conclude.' " (*Jones*, *supra*, 18 Cal.4th at p. 682.) To that end, section 707, subdivision (a)(3)(E), expressly requires the juvenile court to

46

consider the circumstances of the offense, including the minor's actual behavior, degree of involvement, and actual cause of harm.

For these reasons, we instruct the juvenile court on remand to reassess the fifth criterion by giving weight to any relevant factor, including those set forth in section 707, subdivision (a)(3)(E)(ii), all with a view towards O.F.'s amenability to rehabilitation.

### 5. *Conclusion*

To summarize, we conclude that on the record before us, the juvenile court erred in finding the second criterion weighed in favor of transfer. As to the first, third, fourth, and fifth criteria, we instruct the court on remand: (1) to conduct a new analysis that gives weight to all the factors relevant to these criteria (§ 707, subd. (a)(3)(A)(ii), (C)(ii), (D)(ii), (E)(ii)), with a view towards O.F.'s amenability to rehabilitation; (2) to reassess whether the first, third, fourth, and fifth criteria weigh in favor or against transfer, with a view towards O.F.'s amenability to rehabilitation; and (3) to reassess the global question of whether O.F. is amenable to rehabilitation while under the jurisdiction of the court. On remand, the juvenile court remains free to accept new evidence relevant to whether O.F.is amenable to rehabilitation.

### D. Victim Impact Letters

O.F. contends the juvenile court additionally erred by admitting into evidence victim impact statements that were not included in the transfer reports. On this point, we disagree.

Section 656.2, subdivision (a)(1), provides: "Notwithstanding any other law, a victim shall have the right to present a victim impact statement in all juvenile court hearings concerning petitions filed pursuant to Section 602 alleging the commission of any criminal offense. In any case in which a minor is alleged to have committed a criminal offense, the probation officer

47

shall inform the victim of the rights of victims to submit a victim impact statement. If the victim exercises the right to submit a victim impact statement to the probation officer, the probation officer is encouraged to include the statement in his or her social study submitted to the court pursuant to Section 706 and, if applicable, in his or her report submitted to the court pursuant to Section 707. The probation officer also shall advise those persons as to the time and place of the disposition hearing to be conducted pursuant to Sections 702 and 706; any fitness hearing to be conducted pursuant to Section 707, and any other judicial proceeding concerning the case." (§ 656.2, subd. (a)(1).)[7]

In O.F.'s view, section 656.2, subdivision (a)(1), establishes an exclusive procedure for admitting victim impact statements through the probation officer's transfer report, a procedure that was not followed in this case. O.F. maintains that the statute does not grant power to the juvenile court to receive the statements directly, and that they must be "filtered" through the probation officer due to their potentially prejudicial effect and limited relevance. We are not persuaded.

As set forth above, section 656.2, subdivision (a)(1), begins with a recognition of the broad right of victims to present impact statements in juvenile court. The first sentence is then followed by language establishing the duties of probation officers to victims of juvenile crimes. This enumeration of probation officer duties is not reasonably construed as a concomitant limitation on the juvenile court's power to directly receive victim impact statements in an amenability hearing. As section 707, subdivision

---

[7] The probation officer must also provide victims with written information prepared by the Judicial Council concerning the victims' right to civil damages against the minor and his or her parents and the opportunity to be compensated from the restitution fund. (§ 656.2, subd. (a)(2).)

(a)(3), makes clear, the juvenile court's amenability determination is based on the transfer report and "any other relevant evidence" submitted by parties. As such, the court possesses broad discretion to consider victim impact statements, which are potentially relevant to among other things, the fifth criterion factor regarding "the level of harm actually caused by" the minor. (§ 707, subd. (a)(3)(E)(ii).)

O.F. highlights that a former version of section 656.2 stated probation officers "shall" include impact statements in their reports, but a 2013 amendment changed this to "encouraged."  In O.F.'s view, this amendment established the gatekeeping role of probation officers in conveying impact statements to the juvenile court.  We remain unconvinced.  The 2013 amendment changing the mandatory inclusion of victim impact statements in transfer reports to a discretionary but "encouraged" decision by the probation officer was part of the Legislature's effort across several codes to "relieve local entities of the duty to perform reimbursable activities." (See Stats. 2013, ch. 28, § 94.)  In other words, the amendment was intended to protect against overburdening agencies like probation departments.  This in no way suggests the Legislature intended to give probation officers sole discretion to determine whether victim impact statements may be introduced in an amenability hearing.

For these reasons, we conclude the juvenile court did not err in admitting the victim impact statements.

### DISPOSITION

The order transferring O.F. to criminal court is reversed, and the matter is remanded to the juvenile court to conduct a new amenability hearing pursuant to current law and consistent with the views expressed in this opinion.

_____
Fujisaki, Acting P.J.

WE CONCUR:


_____
Petrou, J.


_____
Rodríguez, J.

Trial Court:        Alameda County Superior Court

Trial Judge:       Hon. Scott Jackson

Counsel:           Amanda K. Roze, under appointment by the Court of Appeal, for Defendant and Appellant

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Eric D. Share, Supervising Deputy Attorney General, and Molly A. Smolen, Deputy Attorney General, for Plaintiff and Respondent.

*People v. O.F.* (A166528)

51